**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| DARRYL LIGONS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 10-cv-653-TLW |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Plaintiff Darryl Ligons, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), requests judicial review of the decision of the Commissioner of the Social Security Administration partially granting him disability benefits under Titles II and XVI of the Social Security Act ("Act"). In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge. (Dkt. # 11).

**Introduction**

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). The evidence establishing a disability must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A

plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, a forty-three year old male, applied for disability benefits on November 13, 2007, alleging an onset date of October 1, 2007. (R. 159-62). Plaintiff claimed his mental health issues rendered him disabled. (R. 185-92). The initial denial found that plaintiff had a primary diagnosis of affective mood disorder with a secondary diagnosis of substance abuse disorder, but that he was not disabled. (R. 87). Plaintiff filed for reconsideration, and the denial was affirmed. (R. 88).

Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (R. 100-01). The hearing was held in two parts: on the first date, the ALJ heard testimony from plaintiff and then ordered, at plaintiff's request, a psychological assessment. (R. 31-62). Once the ALJ received the psychologist's report, the hearing concluded on November 4, 2009, with testimony from plaintiff, the consulting psychologist, and the vocational expert. (R. 63-86). Thereafter, the ALJ issued a decision granting plaintiff disability benefits for the period beginning July 14, 2009, the date of plaintiff's psychological assessment. Plaintiff appealed that decision.

### Course of Treatment

Plaintiff began receiving treatment and services at a community therapy center on November 13, 2007, the same date that he filed his application for disability benefits. (R. 159-62, 258). He presented with complaints regarding anger management, sleep disruption, auditory hallucinations, and paranoia. (R. 260). Plaintiff's first appointment with Dr. LaFromboise ("the doctor") was on December 4, 2007. (R. 256-57). The doctor noted that plaintiff admitted to homicidal ideations, but overall, he was quiet and unwilling to talk. (R. 256). She prescribed some medication and ordered plaintiff to make a follow-up appointment in two weeks. (R. 257).

Plaintiff attended follow-up appointments in December 2007 and January 2008. (R. 254, 255). At both appointments, plaintiff reported that he was not compliant with the medication prescribed to help regulate sleep and diminish the auditory hallucinations. Id. He had also failed to obtain the lab work that the doctor prescribed. Id. During the December appointment, the doctor noted that plaintiff was angry and irritable. (R. 255). He appeared confused, and his judgment appeared "to be hanging on by a thread." Id. During the January appointment, plaintiff seemed less angry, but his judgment was not improved, and the doctor noted that he was "barely alert." (R. 254). Plaintiff failed to attend his appointments for the next three months. (R. 316). When he resumed treatment at the end of April 2008, he complained of increased anger and paranoia, due in part to his failure to take his medication. Id. The doctor again noted that plaintiff had failed to obtain the prescribed lab work. Id. The doctor adjusted his medication and prescribed two additional drugs. Id.

Between May and August 2008, plaintiff attended his appointments, but he was not always compliant with his medication. (R. 313-15). He continued to display a great deal of anger, but he stated that his auditory hallucinations were less problematic. (R. 314-15). The doctor noted that plaintiff seemed to display better logic while on his medications, but he always seemed "ready to blow at any time." (R. 313-15).

The doctor noted a significant amount of improvement in plaintiff's mood and behavior from August 2008 through November 2008. (R. 318-20). His behavior was more pleasant, and his anti-social traits were much improved. (R. 319). Plaintiff stated that he was still suffering from paranoia and had difficulty sleeping, but he was no longer hearing voices. (R. 317-20). The doctor noted that plaintiff "looks so much different" when taking his medication. (R. 319). In November 2008, the doctor noted that plaintiff was still having some difficulty affording and

taking his medications and that he was still confrontational. (R. 317). His hallucinations, however, were gone. Id. Plaintiff showed even more improvement during his December 4, 2008, appointment. (R. 324). Plaintiff was sleeping well and had joined a church. Id. He expressed a desire to begin behavior modification therapy to improve his moods and seemed "excited." Id.

Due to plaintiff's difficulty in remembering to take his medication as prescribed, the doctor began writing out a schedule for plaintiff in December 2008. (R. 321, 322). The doctor noted that plaintiff was not taking his medication at the time prescribed, thereby increasing his inability to sleep. (R. 321). The doctor observed, however, that plaintiff no longer complained of hearing voices and that his mood was "softer." (R. 322, 323). Despite the written instructions, plaintiff continued to take his medications off schedule and continued to have difficulty sleeping. (R. 323). In February 2009, he suffered a set-back. (R. 328). Plaintiff told the doctor that he suffered from a hallucination that led to a serious conflict with his roommate. Id. As a result of the confrontation, plaintiff burned his left hand, apparently in an attempt to harm himself. Id.

After his set-back, plaintiff once again began improving. (R. 327). Following the initial disability hearing in April 2009, in which the ALJ stated that he believed plaintiff had a substance abuse problem, plaintiff began taking his medication by injection so that he could also take urinalysis drug screenings to prove that he was not using illegal drugs. (R. 348). All of his drug screens were negative. (R. 345). However, this new regimen agitated plaintiff. (R. 346). Although plaintiff was polite with the doctor, she was receiving complaints that he was aggressive with other patients and the staff. (R. 345). Plaintiff also complained that his paranoia

was increasing. Id. In June 2009, plaintiff and the doctor agreed that plaintiff should return to taking his medication orally. (R. 344).

Throughout this course of treatment, the treating physician diagnosed plaintiff as having paranoid schizophrenia. (R. 325, 338). The doctor also suspected that plaintiff suffered from post-traumatic stress disorder and anti-social personality traits. (R. 313-24, 327-28, 344-45, 347-49). The doctor regularly adjusted plaintiff's medication to help treat his symptoms.

**Disability Proceedings**

After filing his application for disability in November 2007, plaintiff took a mental status exam in January 2008 with Dr. Morgan. (R. 272-73). Dr. Morgan reviewed plaintiff's doctor's December 18, 2007, report from the community therapy center and conducted his own examination. Id. Dr. Morgan found plaintiff to be irritable, hostile, and evasive. Id. He noted that plaintiff was unwilling to answer questions or communicate openly, but he did not find that plaintiff was suicidal or suffering from any disruption in his thought processes. Id. Based on plaintiff's behavior, Dr. Morgan diagnosed plaintiff with adjustment disorder with depressed mood and substance abuse. Id. Dr. Morgan also made a notation to rule out malingering. Id. Dr. Morgan did not comment on the doctor's initial diagnosis of paranoid schizophrenia and notation to rule our post-traumatic stress disorder. Id.

Dr. Morgan's findings formed the basis of the denial of plaintiff's claim and the denial of the reconsideration of his claim. (R. 87-88). The community therapy center where plaintiff's doctor practiced maintained a policy not to provide medical source opinions in disability cases; therefore, when plaintiff filed a request for a hearing to appeal the denial of his claim, his attorney also requested full mental testing. (R. 243). The ALJ granted that request at the first hearing date in April 2009. (R. 61-62).

6

**ALJ Hearing**

On the first hearing date, plaintiff testified that he was paranoid and heard voices on a daily basis telling him to hurt people. (R. 45-47). He claimed that his paranoia and anger prevented him from holding a job. (R. 47-50). Plaintiff testified that he had been fired from several jobs due to confrontations with supervisors, customers, and co-workers. Id. Plaintiff admitted to a history of drug use but testified that he had not used cocaine in years and had last smoked marijuana in 2007. (R. 41-42).

Plaintiff testified that he had been seeking treatment with a doctor since November 2007. (R. 42). He stated that he took his medication, but that he often had trouble remembering when to take it. (R. 42-45). He explained that the doctor had to write out a schedule for him. (R. 45).

Plaintiff also testified that he heard voices regularly but could not explain the discrepancies between his testimony and the treatment notes, which indicated that plaintiff was not having auditory hallucinations. (R. 45-46, 59-61). Plaintiff stated that he heard voices in stressful situations and cited multiple incidents in which he had become aggressive with others. (R. 47-50, 54). Plaintiff described his daily activities, including his habit of shopping early in the morning or late at night to avoid interacting with other people. (R. 56-58). Following plaintiff's testimony, the ALJ noted multiple contradictions between plaintiff's testimony and the record evidence. (R. 59-61). The ALJ then ordered the mental examination that plaintiff had requested. (R. 58-59, 62).

**Psychological Assessment**

Plaintiff underwent a psychological assessment with Dr. LaGrand, a licensed clinical psychologist, on July 14, 2009. (R. 329). Dr. LaGrand conducted multiple tests, including a mental status exam, the Wechsler Memory Scale test, the Wide-Range Achievement Test-Third

7

Edition, and the Minnesota Multiphasic Personality Inventory-2 ("MMPI").  <u>Id.</u>  She found plaintiff's physical appearance normal and his verbal skills low, but adequate.  (R. 331). Plaintiff was organized, logical, and focused, and his thought processes were normal.  <u>Id.</u>  Dr. LaGrand also found that plaintiff was cooperative and put forth his best effort in completing the testing.  (R. 334).

Plaintiff performed at an 8th grade reading level, a 7th grade spelling level, and a 6th grade math level.  (R. 332).  He had adequate memory skills and no problems with persistence and pace.  (R. 332, 333).  Plaintiff's score on the MMPI was invalid due to his critical responses. (R. 332).  Dr. LaGrand opined that "while this can be the result of an attempt to portray oneself in a negative light," she suspected that plaintiff's invalid results were due to his being "in considerable distress and overwhelmed by [his] perceived problems."  <u>Id.</u>  Dr. LaGrand diagnosed plaintiff with post-traumatic stress disorder and major depressive disorder with psychotic features.  (R. 333).  She concluded that plaintiff's ability to perform a job adequately, handle the stress of a job, and interact with others was "low average."  <u>Id.</u>  She did not find that plaintiff would significantly improve in the next twelve months.  (R. 334).

**<u>Continuation of the ALJ Hearing</u>**

Following receipt of Dr. LaGrand's report, the ALJ continued the hearing on November 4, 2009.  Dr. Bedwell, a clinical psychologist, and Ms. Ward, a vocational expert testified at the hearing, and plaintiff offered additional testimony.  (R. 64).  Dr. Bedwell adopted Dr. LaGrand's findings with regard to plaintiff's residual functional capacity.  (R. 72).  He concluded that plaintiff "would have a hard time keeping a job" due to plaintiff's marked limitations to maintain regular attendance and a regular schedule and his moderate limitations with respect to pace.  (R. 75, 78).  Plaintiff offered additional testimony about his anger, paranoia, and auditory

hallucinations.  Id.  Plaintiff maintained that he continued to hear voices encouraging him to hurt people on a daily basis, particularly when he was out in public.  Id.  Plaintiff also stated that he "freaks out" in public and becomes confrontational due to his paranoia.  (R. 76).

Based on this testimony, Ms. Ward, the vocational expert, classified plaintiff as a "store laborer," a category "with an SVP of two, with a medium exertional level."  (R. 80).  The ALJ then posed two hypotheticals for Ms. Ward.  In the first hypothetical, the ALJ asked Ms. Ward to consider a forty-five year old able to perform medium, light, or sedentary work with an ability to understand, remember, and carry out simple instructions.  (R. 81).  The ALJ also included routine supervision and only limited interaction with the public.  Id.  Based on those limitations, Ms. Ward found multiple jobs in the region that plaintiff could perform, including a bench assembler, hotel housekeeper, optical goods assembler, and circuit board assembler.  (R. 82-83). When the ALJ posed the second hypothetical, which included all of the elements of the first hypothetical but added "frequent to constant supervision," Ms. Ward testified that there were no jobs that plaintiff could perform.  (R. 83-84).  Ms. Ward explained that constant supervision was "not compatible with competitive employment."  (R. 84).

**The ALJ's Decision**

The ALJ issued a partially favorable decision granting plaintiff benefits from July 14, 2009, the date of his psychological assessment with Dr. LaGrand.  (R. 24).  The ALJ relied on Dr. Morgan's mental exam and Dr. LaGrand's psychological assessment as the effective dates of plaintiff's diagnoses; therefore, the ALJ's findings regarding the date of plaintiff's disability were determined wholly by the dates of those examinations.  (R. 17-18).

Relying on Dr. Morgan's January 2008 exam, the ALJ found that from October 1, 2007, until July 14, 2009, plaintiff suffered from "adjustment disorder with depressed mood, primary,

cannabis abuse, noncompliance with treatment, and rule out malingering." (R. 18). Based on this diagnosis, the ALJ found plaintiff's claims about his symptoms and limitations not credible. (R. 19). The ALJ also found that plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual," categorizing plaintiff's treatment at the community therapy center as "routine and conservative." Id. The ALJ concluded that plaintiff's combination of mental impairments did not meet a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17).

Likewise, the ALJ relied on Dr. Morgan's January 2008 exam in formulating the first hypothetical that he posed to the vocational expert during the November 4, 2009, hearing. (R. 17, 81-83). The ALJ applied the first hypothetical in his findings, namely that plaintiff could perform "medium, light and sedentary" work with the limitation of understanding, remembering, and carrying out "simple to moderately detailed instructions" under routine supervision with only occasional interaction with the public. (R. 17). The vocational expert testified that a number of jobs existed with those limitations. (R. 81-83). Therefore, the ALJ concluded that plaintiff was not disabled because he had the residual functional capacity to perform a number of jobs in the region. (R. 17, 20).

The ALJ did find, however, that plaintiff's symptoms were "generally credible" after July 14, 2009, the date of plaintiff's psychological exam with Dr. LaGrand. (R. 21). The ALJ listed plaintiff's reported symptoms, as plaintiff reported them to Dr. LaGrand, and the results of the psychological testing. Id. The ALJ also relied on Dr. LaGrand's Medical Source Statement (Mental), which reported that plaintiff had moderate limitation in understanding, remembering, and carrying out complex instructions and marked limitations on his ability to act with others. (R. 21-22). The ALJ applied these limitations to the second hypothetical he posed to the

10

vocational expert at the hearing. (R. 83-84). The ALJ then adopted the vocational expert's opinion that plaintiff could not perform any jobs, given plaintiff's residual functional capacity and the level of constant supervision that plaintiff would require. (R. 21-22).

## ANALYSIS

Plaintiff appealed the determination that he was not disabled prior to July 14, 2009, and alleged four points of error: (1) that the ALJ failed to properly consider the medical source evidence; (2) that the ALJ improperly found that plaintiff was not credible in reporting his symptoms; (3) that the ALJ improperly analyzed plaintiff's residual functional capacity; and (4) that the ALJ's finding of plaintiff's disability onset date is not supported by the evidence. All of these errors are related to the ALJ's finding that plaintiff was not disabled prior to July 14, 2009, the date of Dr. LaGrand's psychological assessment. The Commissioner's response brief argues that the ALJ properly limited its finding of disability to the date of Dr. LaGrand's assessment, given plaintiff's contradictory statements throughout the course of his treatment and Dr. LaGrand's assessment, which is dated from July 14, 2009.

### Credibility Findings

The ALJ found that plaintiff's complaints regarding his symptoms were not credible between October 1, 2007, plaintiff's alleged onset date, and July 14, 2009, the date of Dr. LaGrand's psychological assessment. The ALJ compared plaintiff's testimony to the documentation from the treatment center and Dr. Morgan's January 2008 examination and concluded that "[t]he claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (R. 19). The ALJ also found that plaintiff's subjective complaints had "generally been inconsistent and

unpersuasive and the claimant has not provided convincing details regarding factors that precipitate the allegedly disabling symptoms." (R. 19-20).

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence, because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)).

In this case, the ALJ's credibility findings are supported by substantial evidence. The ALJ noted generally the inconsistencies in plaintiff's various statements to doctors and his testimony in finding that plaintiff's subjective complaints were not reliable. (R. 20). Specifically, the ALJ referenced plaintiff's descriptions of his daily activities, which included caring for himself and, at the date of his application for disability benefits, caring for his two-year-old child. (R. 19). The ALJ also considered plaintiff's evasiveness during Dr. Morgan's examination in January 2008, which was inconsistent with his specific complaints of paranoia, anger and depression when he presented for treatment at the therapy center in November 2007. (R. 18-19). The inconsistencies that the ALJ noted in his decision are just a few examples of the inconsistencies in plaintiff's records and testimony. The ALJ observed additional inconsistencies in plaintiff's testimony during the first hearing in April 2009, including his history of child abuse and his inconsistent statements about the frequency of his auditory hallucinations. (R. 59-61).

The Court also finds that plaintiff's work history prior to October 1, 2007, belies plaintiff's testimony and statements to doctors that he has had problems with paranoia, anger, and auditory hallucinations since age ten. While plaintiff never worked at a regular full-time job, his FICA earnings statements indicate that he worked consistently, albeit at multiple jobs, in 2004, 2005, and 2007. (R. 167). In fact, plaintiff earned more money prior to his alleged onset date in 2007 than he did in any prior calendar year. Id. This evidence is inconsistent with plaintiff's subjective complaints about the severity of his limitations, despite plaintiff's statements that he has suffered from mental health issues almost his entire life. (R. 45-46).

Accordingly, the ALJ's finding that plaintiff's subjective statements about his symptoms and limitations were not credible is supported by substantial evidence, both in the ALJ's opinion and in the record, and is, therefore affirmed.

**Disability Onset Date**

Although the ALJ's findings that plaintiff was not credible are supported by substantial evidence, the ALJ may have erred in concluding that plaintiff's onset date was July 14, 2009. The ALJ concluded that the medical opinion evidence, which consisted of Dr. Morgan's mental exam in January 2008 and Dr. LaGrand's psychological assessment on July 14, 2009, determined plaintiff's onset date. (R. 17-18, 20, 21-22). The ALJ found that Dr. LaGrand's opinion should be "given great weight as it is consistent with the objective medical evidence." (R. 22).

Three of plaintiff's four points of error address this portion of the ALJ's decision. Plaintiff argues that Dr. LaGrand did not intend for her exam date to serve as the onset date for plaintiff's disability, primarily because Dr. LaGrand reviewed all of the treatment notes from the community therapy center as part of her assessment. (Dkt. # 16 at 5-6, 8, 9). Plaintiff argues

13

that the evidence does not support such a finding and that nothing in the record indicates that Dr. LaGrand intended for her assessment to be limited in that way. (Dkt. # 16 at 5-6, 8, 9).

The Commissioner argues that the ALJ properly inferred that Dr. LaGrand's opinion found plaintiff disabled only from the date of her assessment and was not intended to be a "retrospective analysis." (Dkt. # 18 at 5-6). The Commissioner also argues that the ALJ's findings regarding plaintiff's residual functional capacity are consistent with the medical evidence and should be affirmed. (Dkt. # 18 at 8-9). Finally, the Commissioner contends that the July 14, 2009, date is consistent with the evidence contained in the treatment notes and with the vocational expert's testimony. (Dkt. # 18 at 9-10).

Although plaintiff framed this argument in three different ways, the sole issue is whether the ALJ erred in finding that plaintiff was not disabled prior to July 14, 2009, even though plaintiff's symptoms are alleged to have been consistent for the entire relevant period. While the psychological assessment does constitute a medical source opinion finalizing plaintiff's diagnosis, it does not establish the onset date for plaintiff's disability, nor does it draw any conclusions regarding the progression, if any, of plaintiff's symptoms. The record reflects that neither the ALJ nor plaintiff's attorney mentioned their respective interpretations of Dr. LaGrand's assessment during the hearing.

Social Security Ruling 83-20[1] discusses the factors that an ALJ should consider in determining the disability onset date. Where the claimant suffers a traumatic injury, the disability onset date is clear: the date of the injury is applied. SSR 83-20 at *2. In cases of "nontraumatic origin," the Commissioner advised that "the determination of onset involves

---

[1] Social Security Rulings "are binding on all components of the Social Security Administration," including administrative law judges. 20 C.F.R. § 402.35(b)(1). See also Sullivan v. Zebley, 493 U.S. 521, 530 n. 9, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).

consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity. The weight to be given any of the relevant evidence depends on the individual case."[2]  SSR 83-20 at *2.

SSR 83-20 states that for disabilities of nontraumatic origin, "[t]he starting point in determining the date of onset of disability is the individual's statement as to when disability began."  SSR 83-20 at *2.  The ALJ should then consider the claimant's work history because "[t]he day the impairment caused the individual to stop work is frequently of great significance in selecting the proper onset date."  Id.  The ruling also states that "medical evidence serves as the primary element in the onset determination" and that "reports from all medical sources" should be considered.  Id.  The ruling notes that with "slowly progressive impairments," determining the onset date is nearly impossible; therefore, the ALJ may be required to "infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process."  Id.  If the date alleged by the claimant is consistent with the medical evidence, the claimant's alleged onset date should be applied.  See id. at *3.  SSR 83-20 also recognizes that in some cases, the medical evidence cannot provide the ALJ with enough information to reasonably infer the onset date of a disability if it occurred before the date of any recorded medical evidence.  See id.  If the onset date must be inferred, the ALJ is required to seek the services of a "medical advisor" and ensure that any additional medical evidence is obtained before making such an inference.  Id.

---

[2]  The section of SSR 83-20 titled "Onset in Disabilities of Nontraumatic Origin" references physical disability rather than mental disability; however, the section applicable to mental health issues refers only to "cases of currently or previously hospitalized claimants" and is, therefore, inapplicable to plaintiff. SSR 83-20 at *4-5. Plaintiff was seeking only outpatient treatment at the time he alleged the onset of his disability and at the time the ALJ determined plaintiff was disabled. Accordingly, the Court will apply the factors applicable to disabilities of nontraumatic origin.

In this case, the ALJ partially applied the principles of SSR 83-20 when he considered plaintiff's alleged onset date, plaintiff's statements, and the medical evidence. The ALJ erred, however, by adopting the July 14, 2009, date without any explanation of his reasons for choosing the date of the psychological assessment. In light of the other evidence in the record, the July 14, 2009 date is arbitrary.

Notwithstanding the ALJ's credibility findings regarding plaintiff's subjective complaints, which this Court will not disturb, the evidence reflects that plaintiff complained of the same symptoms consistently throughout the relevant period. More importantly, the treatment notes indicate that plaintiff may have suffered from serious issues with anger, paranoia, and depression throughout the relevant period and that his treatment plan was the same before and after July 14, 2009. In fact, plaintiff was much improved by the time Dr. LaGrand conducted the psychological assessment, which the ALJ relied upon to find that plaintiff was disabled. Although the ALJ's conclusion that plaintiff became disabled on the date of the psychological assessment might ultimately be born out, that conclusion is simply not supported by substantial evidence in the current record. See Brockway v. Astrue, 781 F.Supp.2d 1145, 1151-54 (D.Kan. 2011).

When the evidence of the symptoms and course of treatment are consistent both before and after the onset date, the ALJ is required to explain his reasoning. See id. at 1153. In this case, the ALJ offers no rationale for adopting July 14, 2009, as the onset date. In fact, the record does not reflect whether the ALJ considered the onset date to be an issue or whether he applied the standards and guidelines of SSR 83-20. Moreover, the medical evidence to support a finding of plaintiff's disability onset date is ambiguous. The two medical source opinions presented were conducted approximately eighteen months apart and employed different modes of

16

examination.  Additionally, the treatment notes from the community therapy center, which were arguably the best source of medical evidence, could not be used as medical source opinion evidence due to the doctor's explicit statement that she would not provide an opinion for use in the disability proceedings.  The record establishes that the onset date must be inferred and that a medical advisor will be necessary to reach that inference.  See id. at 1154-55.  Therefore, remand is appropriate in this case.  On remand, the ALJ shall implement the guidelines of SSR 83-20 and determine the onset date with the assistance of a medical advisor.

## CONCLUSION

For the above stated reasons, this Court REVERSES and REMANDS the Commissioner's decision granting partial Disability Insurance Benefits for further proceedings consistent with this opinion.

SO ORDERED this 20th day of March, 2012.

_____
T. Lane Wilson
United States Magistrate Judge